### The People v. John Slack.

*Criminal law—Homicide—Intoxication of respondent—Evidence—Manslaughter.*

1. Respondent was one of a large crowd in a saloon, some of whom, including respondent, were more or less intoxicated, but no serious disturbance had occurred. Two of his companions became engaged in a scuffle, and respondent drew his revolver, stepped back a few feet, and holding it at arms-length, and pointing towards the ceiling above the two men, said, "Look out, or I'll shoot." The saloon-keeper told respondent to put the revolver away, and thereupon he lowered it, at the same time looking a little to one side, and fired, killing one of the men, and as the other man arose from the floor, where he had fallen with his companion, respondent fired again, and severely wounded him. The killing was admitted, the defense being that the respondent had become involuntarily intoxicated, and was rendered temporarily insane by some kind of liquor given him by one of the saloon-keepers. And in affirming a conviction of manslaughter it is held:

   *a*—Evidence of certain experiments made with ordinary whisky, and a liquid which respondent's counsel claimed to be of the same character as that which they claimed had produced his involuntary intoxication, is held to have been properly excluded, in the absence of testimony tending to prove the identity of the liquor drank by the respondent with that experimented with.

   *b*—Whether respondent knowingly drew his revolver, which he was unlawfully carrying, and pointed it at the deceased for the purpose of scaring him, or whether he unknowingly shot him in a state of involuntary intoxication, he is guilty of manslaughter.

   *c*—The request of respondent's counsel for an instruction that if the jury found that at the time of the shooting the respondent was in a condition of delirium, and not able to reason, and entertained the delusion or fancy that the persons about him were in some way seeking to injure him, and believed it necessary to use the revolver in his defense from the supposed attack, and used it, impelled thereto by said delusion, he should be acquitted, was not justified by evidence that soon after the shooting respondent said to those present,

"Stand back, don't come near me;" that about two hours afterwards he replied to a witness, who asked him what was the matter at the saloon, that "there was a little crowd this afternoon, and they undertook to press me, and I had to defend myself," the witness, who was a physician, further testifying that respondent's mental condition was that of a badly excited man, but that, in his opinion, he was rational at the time; that when arrested, about four hours and a half after the shooting, he put his hand to his hip, and said something about his revolver, and went towards the cupboard, saying that he wanted the butcher-knife to defend himself with; and that when he got out of doors he was afraid of being mobbed.

Error to Sanilac. (Beach, J.) Argued February 9 and 10, 1892. Decided March 4, 1892.

Respondent was convicted of manslaughter, and sentenced to the State prison for ten years. Affirmed. The facts are stated in the opinion.

*Avery Bros.* and *H. O. Babcock,* for respondent, contended:

1. Voluntary intoxication cannot be received as justification or excuse for crime, whatever the degree to which it may have proceeded; citing *People v. Garbutt,* 17 Mich. 9; but where the respondent is made drunken by stratagem, the fraud of another, by accident, mistake, or the unskillfulness of his physician, or by any means not amounting to a voluntary conscious act on his part, a condition of *dementia* resulting from such intoxication may be pleaded as excuse; citing 1 Hale, P. C. 32; *People v. Robinson,* 2 Park. C. C. 235; *Roberts v. People,* 19 Mich. 414; 4 Amer. & Eng. Cyc. Law, 715; Russ. Cr. 12; 1 Bish. Cr. Law, § 405.

*A. A. Ellis,* Attorney General, and *W. H. Burgess,* Acting Prosecuting Attorney, for the people.

GRANT, J. Under an information charging the respondent with murder, he was convicted of manslaughter.

The respondent commenced drinking intoxicating liquors between 8 and 10 o'clock A. M. of March 22, 1890.

The evidence on the part of the people shows that he drank 18 or 20 times before the commission of the crime, which occurred about 2 o'clock P. M. At this time a large crowd had gathered in the saloon, some of whom, including the respondent, had become more or less intoxicated, but no serious disturbance had occurred. Two of the visitors, named Donnelly and Callaghan, became engaged in a scuffle, standing face to face, and having hold of each other's shoulders. The respondent drew his revolver from his pocket, stepped back a few feet, and, holding his revolver at arms-length, pointing towards the ceiling above Donnelly and Callaghan, said, "Look out, or I'll shoot." The saloon-keeper saw this, and told him to put the revolver away. He thereupon lowered the pistol, at the same time looking a little to one side, and fired, killing Callaghan. Donnelly fell to the floor with Callaghan when he was shot, and as he arose respondent fired again, and severely wounded him.

The killing is admitted. The defense attempted was that the respondent had not become voluntarily intoxicated, but that he had become involuntarily intoxicated, and was rendered temporarily insane by some kind of liquor which one of the saloon-keepers had given him. Counsel, in their brief, state their position as follows:

"The theory of the defense was that when the shooting was done the defendant was unconscious of the act,— was insane,—and that the intoxication producing that condition was caused and brought about by the fraud of Udell, the keeper of the saloon, who, it was contended, gave him, when partly intoxicated, a mixture of some liquid of a fiery nature, which almost immediately produced a condition of great excitement and uncontrollable frenzy."

This drink was taken by respondent shortly before the shooting. The evidence on the part of the people was

that it was taken from bottles, and was composed of birch beer and ginger ale, or from a bottle containing "tonic."

Counsel for respondent offered to show certain experiments that they had caused to be made with ordinary whisky and a liquid which they claimed to be of the same character as the liquid which respondent had taken. This was excluded by the court on the ground that the proof did not show the liquor with which the experiments were made to be of the same character as the liquid drank by the respondent. The evidence offered in this behalf and received was that Udell, a while before the occurrence, had purchased a jug of whisky from one Ward, a liquor dealer, living some miles distant. This evidence came from a witness of the name of Kelly, who testified that he was in Ward's store, heard Udell call for whisky; that he got a gallon, drawn from a barrel which stood "around in west of the bar;" and that he saw Udell take it away with him. One Hebner then testified that in the latter part of April he went to Ward's store, at the request of defendant's attorneys; purchased a half gallon of whisky; that it was drawn from a barrel which stood in the same place where a barrel had stood when he had purchased liquor there about two months before. There was no evidence that the liquor purchased by Udell was taken from the same barrel as that purchased by Hebner, nor that the barrel from which Hebner's was taken stood in the same place as the other. The respondent testified that he drank a part of it, and either threw the rest away or set it down upon the bar; admitted that he was partially intoxicated, but that he was conscious of what he was doing up to the time of taking this drink. After his examination and cross-examination he was recalled by his counsel, and asked if he had tasted any similar liquor, to which he replied that he had, a few moments before, and that its taste was very

similar to that which he drank at Udell's at the time of
the shooting, and that he thought it was the same brand.
His counsel then renewed the offer to introduce evidence
of the experiments above mentioned. It needs no argu-
ment to show that this testimony was properly excluded.
It had no tendency to prove the identity of the liquor
drank by the respondent with that experimented with.

There is no evidence of involuntary intoxication, and
temporary insanity caused thereby, although the judge
instructed the jury upon that theory of the case. The
respondent was unlawfully carrying a deadly weapon.
He knew that he was in the habit of getting intoxicated.
In drawing the revolver and pointing it towards Callaghan
and Donnelly he committed an unlawful act, although he
might have had no intention to shoot or to injure either
of them. One witness testified that he had seen respond-
ent do acts apparently for the purpose of scaring others.
Whether he knowingly drew his pistol for that purpose,
or whether he unknowingly committed the act in a state
of voluntary intoxication, he is guilty of manslaughter.

Respondent's counsel requested the court to charge the
jury as follows:

"If you find that at the time of the shooting the
defendant was in a condition of delirium, and was not
able to reason, and while in that condition entertained
and conceived a delusion or fancy that the persons about
him were in some way seeking to injure him, and believed
it necessary to use the revolver in his defense from the
supposed attack, and used it, impelled thereto by said
delusion, then he should be held not guilty."

The only evidence claimed as a foundation of this
request is as follows: One witness testified that after the
shooting respondent said to those present: "Stand back;
don't come near me." Another testified that he met him
on the street, about 4 o'clock, after the shooting, and

asked him what the matter was up there, to which he replied:

"There was a little crowd this afternoon, and they undertook to press me, and I had to defend myself."

This witness, who was a physician, further testified that his mental condition was that of a badly excited man, but that, in his opinion, he was rational at the time.

Another witness—the officer who arrested him about 6:30 that evening—testified that respondent put his hand to his hip, and said something about his revolver, and that he then went towards the cupboard, saying that he wanted the butcher-knife to defend himself with, and that when he got out of doors he was afraid of being mobbed.

In my judgment, there was nothing in these circumstances, which took place after the shooting, to justify this request, and it was properly refused.

The court instructed the jury that the evidence would not justify a conviction of murder in the first degree, and that they must acquit him of that charge.

The instructions of the court were very favorable to the respondent. We find no error in the record, and the conviction is affirmed.

The other Justices concurred.